**MAKAREM & ASSOCIATES, APLC**
Ronald W. Makarem, Esq. (State Bar No. 180442)
Marni B. Folinsky, Esq. (State Bar No. 209880)
11601 Wilshire Boulevard, Suite 2440
Los Angeles, California 90025-1760
Phone: (310) 312-0299
Facsimile: (310) 312-0296

Michael H. Kim, Esq. (State Bar No. 200792)
**MICHAEL H. KIM , P.C.**
3699 Wilshire Boulevard, Suite 860
Los Angeles, California 90010
Telephone: (213) 639-2900
Facsimile: (213) 639-2909

Attorneys for Plaintiff
ESTHER LEONG, individually and
on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER LEONG, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br><br> SQUARE ENIX OF AMERICA HOLDINGS, INC., a Delaware corporation; SQUARE ENIX, INC., a Washington corporation, <br><br> Defendants. | Case No. CV 09-4484 PSG (VBKx) <br><br> **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT BY DEFENDANTS SQUARE ENIX OF AMERICA HOLDINGS, INC. AND SQUARE ENIX, INC.** <br><br><br> Hearing Date: September 28, 2009 <br> Time: 1:30 p.m. <br> Courtroom: 790 |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION                                                    1

II.  STATEMENT OF FACTS                                             5

III. ARGUMENT                                                       7

  A.  Plaintiff in her First Amended Complaint Has Alleged the      7
      Conduct Constituting Square Enix's "Unfair" and
      "Deceptive" Business Practices

  B.  Charging Fees, Reserving Rights to Assess Fees, Suspend or    9
      Delete Delinquent Accounts In and Of Themselves Are Not
      The "Unfair" or "Deceptive" Business Practices At Issue In
      The Lawsuit

  C.  Plaintiff  Has Alleged All Claims with the Requisite          11
      Specificity

  D.  Plaintiff Has Clearly Alleged Facts Showing That She          12
      Suffered Harm As A Direct Result of Defendants' Unlawful,
      Unfair or Fraudulent Conduct

      1.  Plaintiff Has Sufficiently Alleged Her Harm or Injury     12
          In Fact To Establish That She Has Standing Under
          Article III of the Constitution

      2.  Plaintiff Has Shown (1) That She Suffered Injury In       13
          Fact, and (2) That She Lost Money or Property As A
          Result of Unfair Competition or False Advertising

          a.   Plaintiff Has Shown an Injury In Fact Under the      13
               UCL

          b.   Plaintiff Has Shown That Her Injury was              13
               Caused by Defendants' Unfair and Deceptive
               Conduct

  E.  Plaintiff Has Stated a Cause of Action for Unjust             16
      Enrichment

  F.  Plaintiff's Request for Disgorgement of Profits is Made       17
      Under the Equitable Theory of Unjust Enrichment

  G.  In the Event that the Court is Inclined to Grant the Motion in 18
      any respect, Plaintiff Asks Leave to Amend the Pleading and
      File a Second Amended Complaint

IV.  CONCLUSION                                                     19

# TABLE OF AUTHORITIES

## <u>FEDERAL CASES</u>

Page

AmerisourceBergen Corp. v. Dialysis West, Inc.,

     445 F.3d 1132, 1136 (9th Cir. 2006)           19

Conley v. Gibson, 355 U.S. 41, 48 (1957)           18

Foman v. Davis, 371 U.S. 178, 182 (1962)           19

Germain v. J.C. Penney Co.,

     2009 WL 1971336, *3-*5 (C.D. Cal. Jul. 06, 2009)           11

In re Cardiac Devices Qui Tam Litigation,

     221 F.R.D. 318, 333 (D. Conn. 2004)           11

In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994).           11

U.S. v. Hougham, 364 U.S. 310, 317 (1960)           18

Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1106 (9th Cir. 2003)           11

Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973).           11

## <u>STATE CASES</u>

Californians for Disability Rights v. Mervyn's, LLC,

     39 Cal.4th 223, 227, 228 (2006)           13

County of San Bernardino v. Walsh, 158 Cal.App.4th 533 (2007)           18

Day v. AT & T Corp., 63 Cal.App.4th 325, 332-333 (1998)           8

Hall v Time, Inc., 158 Cal.App.4th 847, 854 (2008)           13

In re Tobacco Cases II, 46 Cal.4th 298 (2009)           14-16

Kasky v. Nike, Inc. 27 Cal.4th 939, 951 (2002)           7,14

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1124, 1144 (2003).           17-18

Lectrodryer v. SeoulBank , 77 Cal.App.4th 723, 726 (2000)           16

## **FEDERAL RULES**

Fed. R. Civ. Proc., Rule 12                                                    1

Fed. R. Civ. Proc., Rule 15                                                   19

Fed. R. Civ. Proc., Rule 9                                                    11

## **STATE STATUTES**

Calif. Bus. & Prof. Code § 17200                                             7

Calif. Bus. & Prof. Code § 17500                                             7

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

# I. INTRODUCTION

This is an improper Rule 56 motion for summary judgment disguised as a Rule 12(b)(6) motion.  The Motion requires this Court to engage in fact and issue findings to determine that the User Agreements and game box (respectively attached as Exhibits A and B to the declaration of Square Enix's general counsel) sufficiently disclose all the penalties and subscription terms associated with the game to overcome the false and deceptive advertising claims.  (Motion at pp. 7-11; *see* Fed. R. Civ. Proc., Rule 12(d).)  The Square Enix defendants further argue that the penalties and subscription terms associated with the game are "common to the online game industry" and hence cannot be "unfair or deceptive." (Motion at pp. 12-13.)  And throughout their entire Motion, defendants never truly grasp the "unfair" aspects of the game, but rather rely on their own interpretation (or misinterpretation) of the claims to come to the conclusion that all the "unfair and deceptive" terms of the game are clearly stated to the public.

Where is the unfairness? What is so deceptive about the game?  There is never really any question that the game is a subscription-based online game that requires a separate fee (called an "online subscription fee"), separate and apart from what is paid to purchase the game, to play the game.  (FAC, ¶¶ 2, 19.) This Subscription Fee is paid to defendants via online account (also referred to as the "PlayOnline Account") that all users have to set up before they can play the game. (FAC, ¶¶ 2, 19.) In this respect, there is an important distinction between what information is provided to users at the point of sale of the game and at the time when they start playing the game.

At the point of sale, users are clueless about what subscription terms and penalties are involved in the game subscription. (FAC, ¶¶ 2, 19.)  The game is simply marketed and sold as an online game that requires online fees to play.  There is nothing more.  The box attached as Exhibit "B" to the declaration of Steve Ross

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

attests to this fact.   In reading the box, which is all that the user sees at the point of sale, one can only understand that this is an online game that requires "internet connection" and "additional online fees" and that acceptance of "certain agreements" is required.  And yet, there is nothing more about the penalties and subscription terms associated with the game, nor does the Box indicate what those "certain agreements" are. (FAC, ¶¶ 2, 19.)

This lack of transparency, nothing short of an intentionally deceptive and unfair business practice, is the main source of plaintiff's contention in this class action.   At the point of sale, users are not informed that:

1. The online  subscription is not a monthly "pay as you go" plan (which is common in the online game industry); rather the Final Fantasy XI online subscription is a perpetual contract that permanently binds users to the subscription on a permanent, continuous and uninterruptable basis irrespective of whether the subscription is used or not; (FAC, ¶¶ 2, 19)

2. Once the Final Fantasy XI online subscription is started[1], it cannot be stopped, skipped or temporarily deactivated, which means the fees have to be paid every month without a stop (again the common practice in the online game industry is that game users are permitted to skip their subscription if they wish not to play and reactivate their subscription only when they want to play); (FAC, ¶¶ 2, 19)

---

[1] The Square Enix defendants spend a great deal of time stressing the fact that the box has an "eye-catching gold sticker" promoting a "FREE SUBSCRIPTION FOR 30 DAYS."   They argue that this sticker clearly alerts users to the existence of monthly subscription fees.  To plaintiff, this gold sticker does more than alert users to the monthly subscription.  This gold sticker is another advertising ploy and deceptive advertising on the part of Square Enix to lure and trap users into starting their online game subscription, knowing that once the subscription is started, it cannot be stopped.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

3. If they miss their online subscription, they incur additional interest, late fees, and reactivation fees to reactive their subscription; (FAC, ¶¶ 2, 19)

4. If they miss their online subscription for more than three months , the original game is forfeited and they have to go out and buy a new copy of the game to play (this kind of forfeiture penalty is unique to Final Fantasy XI and no other online game developer in the industry has it); (FAC, ¶¶ 2, 19)

5. If they miss their online subscription for more than three months, their game characters[2] are lost, and all payments made to purchase the characters and all online fees paid up to that time to build the characters are lost (again this is unique to Final Fantasy XI and no other online game has this penalty); (FAC, ¶¶ 2, 19)

6. The online game servers might be shut down at any time, blocking users from paying their online fees on time, which automatically result in involuntary penalties, interest and reactivation fees. (FAC, ¶¶ 2, 19)

Again, it is not the payment of online fees that is questioned in the lawsuit. The critical aspect of defendants' deceptive and unfair business practices is the manner in which they concealed the terms of the online subscription and the various penalties, i.e. forfeiture of the game and game character, for failing to pay the online fees. (FAC, ¶ 20.)  This lawsuit is more than about online fees; it is about *undisclosed penalties* imposed on users to bind them to the subscription. (FAC, ¶ 20.)

We now turn to the second point of deception, when users open the box, read the User Agreements and start their online subscription.  By this time, users have

---

[2] Each game disk comes with one game character.  Any additional game characters can be purchased from Square Enix at the monthly cost of $1 per month.

already paid money to buy the game.  Defendants' deceptive and unfair business practices at this point concern what is disclosed to users at the point they start the subscription.  At this point, what information is available to inform users of the aforementioned penalties and subscription terms?   Defendants cite to the User Agreements to vainly argue that all these penalties and subscription terms are adequately disclosed in the User Agreements.  Defendants cite to five specific clauses in the User Agreements to argue that all the "deceptive aspects" of the game are disclosed to users: Clause 4.1 Ownership and Rights,  Clause 5.2 Subscription Fee, Clause 5.2(a) Payment of Fee, Clause 5.2(b) Authorization of Monthly Payment,  and Clause 5.2(c) Late Fees and SEUI Rights. (Motion at pp. 7-11.)

And yet none of the clauses mention anything about forfeiture of the game and game characters as a penalty for failure to pay the online subscription fees for three months; payment of monthly subscription fees on a permanent and continuous basis whether or not access or use of the game is desired; no right to skip or temporarily deactivate the online subscription; unannounced shutdowns of the server system for maintenance that will interfere with users' payment of the online subscription fees which automatically result in additional late fees, interest and reactivation fees to the users.  (Steve Ross Decl., Exh. A.)

In the Motion, defendants now argue that they have the right to impose these penalties, i.e. force users to buy a new copy of the game, delete game characters, shutdown the game servers, because they own "all right, title and interest in and to the PlayOnline Service, the Software and all Documentation, and will be sole owner of any and all data you generate through your use of the PlayOnline Service, and you receive only limited rights to access and use PlayOnline Service." (Steve Ross Decl., Exh. A.) This treatment of the game software as a license, with restrictions and limitations on the user's right in and to the game software, appears nowhere on the box and is conveniently tucked away at page 133 of the User Agreements

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

(which the user cannot read until the game is bought and the game box is opened, at which point the game can no longer be returned and refunded).  This kind of sales tactic, treating the initial game purchase as a sales transaction and then changing the transaction as a mere license after the game is purchased, clearly raises a question about whether defendants are engaged in deceptive and unfair business practices.[3]

## II. STATEMENT OF FACTS

Final Fantasy XI online is an online multi-player game developed, marketed and sold by Square Enix. Since its first development and sale, the Square Enix defendants have sold over 500,000 copies of the game.[4] (FAC, ¶¶ 12, 13.)   The games are sold at authorized retail stores and online stores such as Amazon, EB Games, GameStop, Target, and Walmart.

Plaintiff Esther Leong purchased the game and played the game for two years before stopping her subscription. (FAC, ¶ 22.) She returned to the game after about a year, only to find out that she could not use the game with her old account. (FAC, ¶ 23.)  She was forced to go out and purchase a new copy of the game to play again. (FAC, ¶ 23.)   She also lost all of her game data and characters, resulting in her forfeiture of not only the game she originally purchased but also the subscription fees she has paid to build her game characters. (FAC, ¶ 23.)

Plaintiff Esther Leong is ideally suited to represent the class simply because she has suffered all the wrongs alleged in this lawsuit:

1.  She purchased the game without being informed that the subscription was a perpetual and fixed contract that required her to pay her monthly online fees regardless of whether she accessed or used the game; (FAC, ¶ 21)

---

[3] Each purchase of the game comes with one game character.  If the use wishes to purchase additional characters, he or she can purchase them from Square Enix and pay additional online fees to "develop" these characters.
[4] Given that Square Enix defendants have developed and published four "expansion packs" to the original game, the number of copies sold will likely number in excess of a million.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

2. She purchased the game without being informed that she could not skip or temporarily deactivate her subscription; (FAC, ¶ 21)

3. She purchased the game without being informed that the subscription was unlike any other online game subscription out there, where players are permitted to pay for their online subscription only when they want to access or use the game; (FAC, ¶ 21)

4. She purchased the game without being informed about the penalties associated with her failure to pay the monthly online fees; (FAC, ¶ 21)

5. She purchased the game without being informed about the late fees, interest and reactivation fees associated with the game; (FAC, ¶ 21)

6. She purchased the game without being informed that she was merely given a license to use the game and that she had no right to own the game or game characters she purchased from Square Enix; (FAC, ¶ 21)

7. She started her monthly subscription without being clearly and fully informed that her subscription is not really a monthly subscription but rather it is a permanent and perpetual contract that does not allow her to skip a month; (FAC, ¶ 21)

8. She started her monthly subscription without being clearly and fully informed that this is not a month-to-month or "pay as you go" plan. Rather the monthly subscription, contrary to how it is described by defendants, does not allow her to temporarily skip or deactivate her subscription; (FAC, ¶ 21)

9. She started her monthly subscription without being clearly and fully informed that her failure to keep her monthly subscription would result in permanent forfeiture of the game and game characters. (FAC, ¶ 21.)

Again, the aforementioned penalties and terms are unique in the online game industry and are clearly intended to "lock in" users to the online subscription. As a

result, plaintiff Leong suffered "injuries in fact" common to all the other members of the Class as follow:

1. She was induced to pay money to purchase the game under terms and conditions she did not want[5]; (FAC, ¶ 21)

2. She lost the original game that she paid for; (FAC, ¶ 23)

3. She was induced to start her subscription and pay her monthly subscription fees subject to hidden terms and conditions she did not want; (FAC, ¶ 21)

4. She lost her game characters that she spent money to purchase from Square Enix and paid significant fees to develop.[6] (FAC, ¶ 23)

## III. ARGUMENT

**A.** **Plaintiff in her First Amended Complaint Has Alleged the Conduct Constituting Square Enix's "Unfair" and "Deceptive" Business Practices.**

To state a claim under either the Unfair Competition Law (Calif. Bus. & Prof. Code § 17200) or the False Advertising Law (Calif. Bus. & Prof. Code § 17500), it is necessary only to show that consumers are likely to be deceived. As the California Supreme Court in <u>Kasky v. Nike, Inc</u>. 27 Cal.4th 939, 951 (2002) held:

---

[5] Once a video game or game software is purchased and opened, it cannot be returned for a refund.

[6] Again, defendants allude to the "Ownership and Rights" clause in the User Agreement that the buyer is allegedly required to agreed to before starting his subscription. There are several problems with this argument. First, the User Agreement is not shown on the box or at the time of purchase. So when a user buys the game software, he does not know that he is merely buying a revocable license to use the software and that any and all data developed from his play of the game are "owned" by Square Enix. This adds another layer of deception that Plaintiff will likely add to the pleading. Second, the Ownership and Rights Clause is vague about "game data," and there is no information that the term "game data" was intended to apply to "game characters" that users buy from the defendants. Third, each game comes with one game character. So when a buyer buys the game, he understands that he is also buying game character from Square Enix. And if he wants additional characters, he can buy them from Square Enix and pay additional online fees to develop them. To argue that the User Agreements somehow change the nature of those "game character" purchases as "rentals" or "licenses" clearly underscores the depth and level of Square Enix's deceptive advertising and unfair business practices.

> This court has recognized that "[a]ny violation of the false advertising law ... necessarily violates" the UCL. (Citations omitted.) We have also recognized that these laws prohibit "not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." (Citation omitted.) Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, "it is necessary only to show that 'members of the public are likely to be deceived.' " (Citations omitted.)

Under the False Advertising Act and the UCL, "a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, <u>such as by failure to disclose other relevant information</u>, is actionable." <u>Day v. AT & T Corp.</u>, 63 Cal.App.4th 325, 332-333 (1998) (Emphasis added.)

Plaintiff clearly states in her complaint what material information Square Enix failed to disclose to users:

1. The online subscription is not a monthly "pay as you go" plan (which is the normal practice in the online game industry).  Instead, the Final Fantasy XI online subscription is a perpetual contract that permanently binds users to the subscription on a permanent and continuous basis irrespective of whether the subscription is used or not; (FAC, ¶¶ 2, 19)

2. Once the Final Fantasy XI online subscription is started it cannot be stopped, skipped or temporarily deactivated, which means the subscription fees have to be paid without a stop (again the common practice in the online game industry is that game users are permitted to skip their subscription if they wish to stop playing and reactivate their subscription only when they want to play); (FAC, ¶¶ 2, 19)

3. If they stop their online subscription for whatever reason, they incur additional interest, late fees, and reactivation fees to reactive their subscription; (FAC, ¶¶ 2, 19)

4. If users fail to pay the subscription fees (in other words, if they miss their online subscription) for more than three months, the original game is forfeited and they have to go out and buy a new copy of the game to play (this kind of forfeiture penalty is unique to Final Fantasy XI and no other online game developer in the industry has it); (FAC, ¶¶ 2, 19)

5. If they miss their online subscription for more than three months , their game characters are forfeited, and any and all payments and fees paid to purchase the game characters are forfeited (again this is unique to Final Fantasy XI and no other online game has this penalty); (FAC, ¶¶ 2, 19)

6. The online game servers might be shut down at any time, blocking users from paying their online fees on time, which automatically result in involuntary penalties, interest and reactivation fees. (FAC, ¶¶ 2, 19.)

None of this relevant information is disclosed on the game box (at the point of sale) or in the User Agreements (at the point of subscription).  Defendants' supporting Exhibits clearly attest to their own deceptive and unfair business practices.

**B.    Charging Fees, Reserving Rights to Assess Fees, Suspend or Delete Delinquent Accounts In and Of Themselves Are Not The "Unfair" or "Deceptive" Business Practices At Issue In The Lawsuit.**

The Square Enix defendants conveniently overlook the real allegations and focus on those aspects of the game are not part of the UCL and False Advertising claims: monthly Subscription Fees, late fees, reactivation fees, etc.   The plaintiff and her class do not question the validity of these fees, nor is the practice of charging such fees challenged in this lawsuit.  These fees in and of themselves are not at issue.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

For example, it is not the monthly Subscription Fees that are questioned here. Rather, it is the practice of failing to disclose to users that the online subscription is not a "pay as you go" monthly plan, or for that matter, a monthly plan at all.  The online subscription in reality is a perpetual and continuous contract that permanently binds users to the subscription without any option of temporarily stopping the subscription.  The deceptive part about Square Enix's practice is that the monthly subscription fee has to be paid without a stop, whether the game is used or not.

Also, it is not the late fees and reactivation fees themselves that are questioned in this lawsuit.  Rather, it is defendants' practice of concealing from users, before they buy the game or start their subscription, that once the subscription is started it cannot be stopped, and any attempt by users to stop, skip or temporarily deactivate the subscription results in further penalties, late fees, and reactivation fees.  None of these "aspects" of the game are "garden-variety," nor are they contained within the four corners of the agreement.[7]

Also, contrary to defendants' assertion, none of these "aspects" of the game are "common to the online game industry."  To the contrary, the common practice in the online game industry is that an online game subscription is a "pay as you go" monthly plan that allows users to pay for their monthly subscription only when they want to play the game— in other words, users can stop and go back to the game without the risk of losing the game software, game data and game characters.  The forfeiture penalties are unique to Final Fantasy XI, and cannot be found anywhere

---

[7] The game box references "certain agreements" that must be accepted before the game is played, and yet there is no mention of what those "certain agreements" are.  The Square Enix defendants spend a great deal of time stressing the fact that the box has an "eye-catching gold sticker" promoting a "FREE SUBSCRIPTION FOR 30 DAYS."  They argue that this sticker clearly alerts users to the existence of monthly subscription fees.  To plaintiff, this gold sticker does more than alert users to the monthly subscription.  This gold sticker is another advertising ploy and deceptive advertising on the part of Square Enix to lure and trap users into starting their online game subscription, knowing that once the subscription is started, it cannot be stopped.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

in the online game industry.

**C.   Plaintiff Has Alleged All Claims with the Requisite Specificity.**

Defendants contend that plaintiff must allege her claims with the heightened specificity requirements of Rule 9(b) because the complaint "sounds in fraud." Rule 9(b) does not apply here, but even if it did, the pleading's factual allegations are more than adequate under Rule 9(b).

A pleading is sufficient under Fed. R. Civ. P. 9(b) if it "[identifies] the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973). This requires that a false statement must be alleged, and that "circumstances indicating falseness" must be set forth. In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). "The plaintiff must set forth what is false or misleading about a statement and why it is false." Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1106 (9th Cir. 2003); see also, Germain v. J.C. Penney Co., 2009 WL 1971336, *3-*5 (C.D. Cal. Jul. 06, 2009)

However, courts have relaxed Rule 9(b)'s heightened pleading standard in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of different documents. See In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318, 333 (D. Conn. 2004) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.")

Here, plaintiff has clearly met the heightened pleading standard of Rule 9(b). Plaintiff has sufficiently identified "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly

Enterprises, 476 F.2d at 397.  Plaintiff has alleged that (1) Who: Square Enix was responsible for developing, marketing and selling the game (FAC, ¶ 12); (2) What: Square Enix failed to disclose all relevant information about the game subscription terms and penalties (FAC, ¶¶ 2, 19); (3)  When: Since Square Enix first started marketing and selling the game in 2002 to present, spanning a period of 6 years, they have failed to disclose the online subscription terms and penalties at the point of sale and at the point of subscription (FAC, ¶¶ 12, 14-18, 19); (4)  Where: At the point of sale where the game is purchased, and at the game subscription website, www. Playonline.com (FAC, ¶¶ 14-18, 19); (5) How:  By materials at the point of sale and via the Internet at the website, www.Playonline.com, where the online subscription takes place. (FAC, ¶¶ 14-18, 19.)

It would be unreasonable require plaintiff to plead anything more specific prior to discovery.

**D.   Plaintiff Has Clearly Alleged Facts Showing That She Suffered Harm As A Direct Result of Defendants' Unlawful, Unfair or Fraudulent Conduct.**

**1.   Plaintiff Has Sufficiently Alleged Her Harm or Injury In Fact To Establish That She Has Standing Under Article III of the Constitution.**

Plaintiff  has suffered an "injury in fact" under Article III because:

1. She was induced to pay money to purchase the game subject to hidden terms and conditions she did not want[8]; (FAC, ¶ 21)

2. She lost the original game that she paid for; (FAC, ¶ 23)

3. She was induced to start her subscription and pay her monthly subscription fees subject to hidden terms and conditions she did not want; (FAC, ¶ 21)

---

[8] Once a video game or game software is purchased and opened, it cannot be returned for a refund.

4. She lost her game characters, which resulted in the loss of all the monies she paid buy the characters and build them. (FAC, ¶ 23.)

2. **Plaintiff Has Shown (1) That She Suffered Injury In Fact, and (2) That She Lost Money or Property As A Result of Unfair Competition or False Advertising.**

a. **Plaintiff Has Shown an Injury In Fact Under the UCL.**

A plaintiff must have suffered an "injury in fact" and "lost money or property as a result of such unfair competition" to have standing to pursue either an individual or a representative claim under the California unfair competition law. Hall v Time, Inc., 158 Cal.App.4th 847, 854 (2008) (citing Californians for Disability Rights v. Mervyn's, LLC, 39 Cal.4th 223, 227, 228 (2006)). Under the first prong of the test for standing, a plaintiff suffers an injury in fact for purposes of standing under the UCL when he or she has:

(1) expended money due to the defendant's acts of unfair competition;

(2) lost money or property; or

(3) been denied money to which he or she has a cognizable claim.

Hall v Time, Inc., 158 Cal.App.4th at 849.

Clearly, plaintiff has alleged that she has "lost money and property" and "expended money due to defendants' acts of unfair competition." She was induced to spend money to buy the game and pay for her game subscription, which she would not have purchased had she been aware of the unconscionable terms and penalties to which the game is subject. (FAC, ¶¶ 21-23.)Also, as a result of the undisclosed penalties, she lost her original copy of the game and her game characters that she spent money to buy from Square Enix. (FAC, ¶ 23.)

b. **Plaintiff Has Shown That Her Injury was Caused by Defendants' Unfair and Deceptive Conduct.**

The complaint before us alleges that Square Enix violated the UCL by

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

engaging in deceptive advertising and misleading statements about the terms and conditions of the online subscription associated with the game, *Final Fantasy XI*, and the draconian penalties that follow from breach of those terms. Defendants argue that plaintiff has no standing to bring a UCL claim because she has failed to allege "actual reliance" on the allegedly deceptive or misleading statements with the level and depth of specificity that is called for in common –law fraud. Defendants are wrong on several grounds: (1) The "actual reliance" requirement is required if the plaintiff is proceeding on a claim of fraud as the basis of his or her UCL action. The "actual reliance" requirement has no application when the plaintiff is asserting "deceptive advertising" or "unfair" business practice as a basis for the UCL claim in which case she only needs to prove that "members of the public are likely to be deceived"; (2) Second, the level of specificity demanded by defendants is not required to plead "actual reliance" under the UCL; (3) Third, plaintiff has alleged sufficient facts to raise an inference or presumption of reliance on the fraud.

The UCL defines unfair competition as "any unlawful, unfair or fraudulent business act or practice . . . ." (Calif. Bus. & Prof. Code § 17200.) The *actual reliance* requirement only applies to the third prong of the statute — an allegation of a fraudulent business act or practice. In re Tobacco Cases II, 46 Cal.4th 298, 311-12 (2009). However, "to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be 'deceived.' "' " In re Tobacco Cases II, 46 Cal.4th at 312 [quoting Kasky v. Nike, *Inc.*, 27 Cal.4th 939, 951 (2002)]. Since, plaintiff is asserting deceptive advertising and unfair business practice as alternative bases for the UCL claim, any deficiency in the "actual reliance" pleading is not fatal to the claim. (FAC, ¶ 32.)

Second, plaintiff need not demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement. *Id.*, at 327. The plaintiff

merely has to allege that the fraud played a substantial part, and so had been a substantial factor, in influencing her decision to engage in the injury-producing conduct. *Id*., at 326:

> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. " 'It is not ... necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct.... It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.' [Citation.] [¶] Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. [Citations.] A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' [citations], and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.' [Citation.]"

> Nor does a plaintiff need to demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement. This principle is illustrated in a pair of tobacco case decisions that upheld verdicts for plaintiffs against substantial-evidence challenges, specifically focusing on the sufficiency of the evidence supporting reliance.
>
>          *     *     *
>
> These decisions provide a framework for what plaintiffs must plead and prove in UCL fraud actions in terms of reliance. These cases teach that, while a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct. Furthermore, where, as here, a plaintiff alleges exposure to a long-term

- 15 -

> advertising campaign, the plaintiff is not required to plead
> with an unrealistic degree of specificity that the plaintiff relied
> on particular advertisements or statements. Finally, an
> allegation of reliance is not defeated merely because there was
> alternative information available to the consumer-plaintiff,
> even regarding an issue as prominent as whether cigarette
> smoking causes cancer. Accordingly, we conclude that a
> plaintiff must plead and prove actual reliance to satisfy the
> standing requirement of section 17204 but, consistent with the
> principles set forth above, is not required to necessarily plead
> and prove individualized reliance on specific
> misrepresentations or false statements where, as here, those
> misrepresentations and false statements were part of an
> extensive and long-term advertising campaign.

In re Tobacco Cases II, 46 Cal.4th at 326-327, 328 (Internal citations omitted).

Contrary to Square Enix's assertion, it is not required that plaintiff "identify" the specific advertising statements that allegedly induced her to engage in the injury-producing activity.

Third, plaintiff has shown that the omitted information is *material* as it directly controls the user's rights and interest in the game, the terms and conditions of his online subscription, and the forfeiture penalties that essentially deprive the user of his right to use the game.  See In re Tobacco Cases II, 46 Cal.4th at 326. These facts are "material" and are sufficient to raise a presumption, or at least an inference, of reliance. *Id.*

**E.    Plaintiff Has Stated a Cause of Action for Unjust Enrichment.**

First, as conceded by defendants, Plaintiff would have a valid claim for unjust enrichment if the UCL and False Advertising claims are viable.  Since Plaintiff has alleged facts sufficient to state both causes of action, her unjust enrichment claim survives.

Second, the unjust enrichment claim is predicated on Square Enix's receipt of a benefit and unjust retention of that benefit from their own unlawful, unfair and fraudulent business practices.  Lectrodryer v. SeoulBank , 77 Cal.App.4th 723, 726

(2000) (holding that unjust enrichment is  receipt of a benefit and unjust retention of the benefit at the expense of another).  The existence of an express contract does not preclude this equitable claim, where the contract itself is part of a pattern of defendant's false advertising and unfair competition.

Finally, there is no merit to Defendant's argument that Plaintiff received a *full benefit* for the money she paid Square Enix.  She lost her game software and is now forced to go out and buy a new copy of the game. This is not the benefit she expected for the money she paid Square Enix to buy the game.

She spent money to buy her game characters from Square Enix and spent additional monthly fees to build and develop her characters, only to see the game characters (in which she has a positive property interest) taken away by Square Enix.  (FAC, ¶¶ 21-23.) She now has to buy new game characters from Square Enix and start from the beginning. (FAC, ¶¶ 21-23.)  This is not the benefit she expected for the money she paid Square Enix to buy and develop her digital property.

Finally, Square Enix argues that plaintiff cannot claim unjust enrichment from losing her game software and game characters because the Ownership and Rights clause in the User Agreement states that all software and game data belong to Square Enix, not the end user who paid money to purchase them from Square Enix.  As argued before, the enforceability and applicability of the Ownership and Rights clause are highly questionable here, and it begets the real question why the Ownership and Rights clause is not presented to users before they *buy* the game and game characters.  Again this kind of argument underscores Square Enix's persistent pattern of deception and fraudulent conduct to lull consumers.

F.    **Plaintiff's Request for Disgorgement of Profits is Made Under the Equitable Theory of Unjust Enrichment.**

There is no dispute that under the UCL or the False Advertising Law, individual consumers may not pursue claims for disgorgement of profits. *See* <u>Korea</u>

Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1124, 1144 (2003). However, disgorgement of profits is sought under the equitable theory of unjust enrichment. See County of San Bernardino v. Walsh, 158 Cal.App.4th 533 (2007) (disgorge the ill-gotten gains they received in the bribery scheme). In discussing damages properly based on unjust enrichment, the *Walsh* court noted:

> The principle of unjust enrichment, however, is broader than mere "restoration" of what the plaintiff lost. Many instances of "liability based on unjust enrichment ... do not involve the restoration of anything the claimant previously possessed ... includ[ing] cases involving the disgorgement of profits ... wrongfully obtained...." "[T]he public policy of this state does not permit one to 'take advantage of his own wrong'" regardless of whether the other party suffers actual damage. *Where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust ... [t]he defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched."*

Id., at 542 (Internal citations omitted.)

**G.     In the Event that the Court is Inclined to Grant the Motion in any respect, Plaintiff Asks Leave to Amend the Pleading and File a Second Amended Complaint.**

In the event that the Court is inclined to grant any aspect of this Motion to Dismiss, Plaintiff respectfully requests leave to amend the pleading and file a Second Amended Complaint to correct any deficiencies noted by this Court. Plaintiff makes this alternative request on grounds that "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." U.S. v. Hougham, 364 U.S. 310, 317 (1960) [quoting Conley v. Gibson, 355 U.S. 41, 48 (1957)].

Rule 15(a) is liberally applied, and leave to amend "shall be freely given when justice so requires." <u>AmerisourceBergen Corp. v. Dialysis West, Inc.</u>, 445 F.3d 1132, 1136 (9th Cir. 2006). The Supreme Court has endorsed a liberal reading of this rule, even when the proposed amendment states an alternative theory of recovery, stating that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits ." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).

As Plaintiff has shown, there are serious questions regarding Square Enix's decision to hide the online subscription terms and penalties from users when they purchase the game.  This non-disclosure also tricks users into buying game characters and paying fees to start their subscription.  The end result is that users are stuck with a game subscription that is continuous and perpetual, and the penalty for missing their subscription (and this is the part that is astonishingly fraudulent) is "forfeiture" the game and game characters that they bought from Square Enix. Contrary to Square Enix's contention that this game subscription setup is "common" in the online game industry, Square Enix's game subscription cannot be found anywhere in the gaming industry.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Square Enix's Motion to Dismiss in its entirety.  Alternatively, if the Court is inclined to grant any part of the Motion to Dismiss, Plaintiff respectfully requests leave to amend the complaint and file a Second Amended Complaint so that the issues can be resolved on their merits.

Dated: September 14, 2009          MAKAREM & ASSOCIATES, APLC

                                   By:_____
                                        RONALD W. MAKAREM
                                        MARNI B. FOLINSKY

- 19 -

PROOF OF SERVICE
(Code of Civil Procedure §1013A(d))

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 11601 Wilshire Boulevard, Suite 2440, Los Angeles, CA 90025-1740.   On September 14, 2009, I caused the foregoing document described as:
Plaintiff's Opposition to Motion to Dismiss First Amended Complaint
By Defendants Square Enix of America Holdings, Inc. and Square Enix, Inc.

Said document was served on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Joel D. Siegel, Esq.                          Christian S. Genetski, Esq.
Sonnenschein Nath & Rosenthal LLP             Sonnenschein  Nath & Rosenthal LLP
601 South Figueroa Street                     1301 K Street, N.W. Suite 600 East Tower
Suite 2500                                    Washington DC, 20005-3364
Los Angeles, California 90017-5704            Facsimile: 213-623-9924
Facsimile: 202-408-6399

___BY MAIL:  I deposited such envelope in the mail at Los Angeles, California.    The envelope was mailed with postage thereon fully prepaid.  I am readily familiar with this business' practice for collection and processing of mail and that on the same day, and in the ordinary course of business, said mail is deposited in the United States Mail with postage thereon fully prepaid at Los Angeles, California.  I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit/proof of service.

__ _ PERSONAL SERVICE:  I delivered said envelope by hand to the offices of the addressee(s).

___ VIA FACSIMILE:  On to the interested parties above-designated at the fax numbers noted above.

_xx_ VIA OVERNIGHT DELIVERY:  I placed such envelope for regularly scheduled pickup at our offices on the date of this declaration by our usual overnight delivery service.

__xx___ (Federal) I declare that I am employed in the offices of a member of the bar of this court at whose direction the service was made.
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 14, 2009, at Los Angeles, California.

Stefani McDowell